IN THE UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2010 JUN 25  PM 4: 56

GREGORY C. LANGHAM
CLERK

FOR THE DISTRICT OF COLORADO

Civil Action No.: 10 –cv- '10 – CV – 0 1 5 0 6 msk BNB

_____ DEP. CLK

JANE DOE

        Plaintiff

v.

T-MOBILE USA, INC.

        Defendant

---

COMPLAINT, JURY DEMAND AND MOTION TO PRESERVE ANONYMITY

---

COMES NOW Plaintiff, pro se, and for her Complaint and Motion states and alleges as follows:

MOTION TO PRESERVE ANONYMITY

1. Due to Plaintiff's and Defendant's duties to mitigate, Plaintiff is actively seeking replacement work.

2. Potential employers undertake background investigations.

3.  It is more likely than not, that Plaintiff's disability will be discovered, by and through this litigation's filing and as a result of future employer background investigations authorized under the Fair Credit Reporting Act ["FCRA"].

4.  The Americans With Disabilities Act is specific in its restrictions, proscriptions, intended protections, injunctions and prohibitions when it comes to invasive pre-hire, applicant questioning about prior medical, physical or psychological impairments, afflictions, handicaps, disabilities and/or serious health conditions

5.  There is a conflict of law between the Plaintiff's common law duty to mitigate, FCRA and the Americans with Disabilities Act.

6.  As a result, this is a complaint being filed under the pseudonym, "Jane Doe".

7.  This lack of an identifier on the subject pleadings is not one which prejudices, may prejudice or could prejudice the Defendant, directly or indirectly.

8.  Any opposition to protecting the Plaintiff's identity can only be based on vexatious or vindictive motives as its disclosure serves no purpose. Constitutionally, the Defendant is facing its accuser with actual notice and knowledge of who that accuser is.

9.  The Plaintiff has identified herself or himself with all necessary contact information, requested to be excluded from the court's publicly accessible file, under separate correspondence, to the Defendant and to this honorable tribunal.


FOOTNOTE: Exhibit Management: Some exhibits have been embedded into the Complaint. All remaining exhibits are described and being provided to Defendant under separate cover.

## PARTIES AND VENUE

10. Plaintiff is an individual who was formerly employed as, *inter alia,* a Customer Service Representative

11. Defendant is a company registered to do business Colorado.

12. Defendant's main offices are in Bellevue, Washington 98006; 877 453 1304

13. Venue and Jurisdiction are proper in this Court since the Defendant does business in El Paso County Colorado.

14. Plaintiff filed an EEOC Charge on or about April 9, 2009. Charge No. DORA E20090559; EEOC Charge No.: 32A-2009-00349

15. Plaintiff received her right to sue letter on or about March 30, 2010.

16. This is an action based on retaliation and disability discrimination under the Americans with Disabilities Act and the Colorado Anti-Discrimination Act and violation of the Family and Medical Leave Act, breach of contract [management dishonoring, denying and defying its own "non-contractual" policies while requiring employees to agree to adhere to those policies as a condition and term of employment.]

17. Discrimination Claims. Plaintiff jointly filed her employment discrimination claims with the Equal Employment Opportunity Commission and the Colorado Civil Rights Division.

18. Exhaustion. Plaintiff repeatedly attempted to exhaust her administrative remedies by contacting the Company in an effort to achieve informal resolution. This occurred on three separate occasions.

19. Plaintiff met multiple times with HR and management relative to the conduct depicted herein.

20. Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 et seq. [due to the Defendant's constructive discharge of Plaintiff, failure to accommodate, open hostility, disability harassment and retaliating against Plaintiff and regarding Plaintiff as disabled - irrespective of whether Plaintiff is or is not found to be a qualified individual with a disability] was violated.

21. The Family and Medical Leave Act ["FMLA"], 29 U.S.C. Section 2601 et seq. and 29 C.F.R. Section 825 et seq., entitled Plaintiff to leave for a "serious health condition" as defined by law.

22. Plaintiff used and attempted to use her FMLA leave, later suffering retaliation as described below for doing so.

23. The FMLA authorizes that an aggrieved party may sue for relief under the Act.

24. Constructive [wrongful] discharge from employment.  The Defendant compelled the separation of the Plaintiff by its misfeasance, malfeasance and nonfeasance, dishonoring its own policies which are purportedly mandatory or obligatory upon all employees, including management.  Misrepresentations in the Defendant's policies and procedures, misappropriation and theft of Plaintiff's time off entitlements, caused Plaintiff to separate from the Company.

25. Promissory estoppel. Defendant's agent, Jim Nelson, promised Plaintiff that he would cause a correction in Plaintiff's leave entitlements. This he did not do.  This prevented Plaintiff from moving laterally to a different team [shift bid.]This also obstructed Plaintiff

from being qualified for merit raises. [Exhibit 1: Statistical print out of 2008 quarter three metrics showing uncorrected absenteeism; print date 01/06/2009.]

26. All EEOC charges are consolidated in Exhibit 2. [Exhibit 2: Charges submitted to the DORA and EEOC in April 2009.]

27. Pendent jurisdiction is present under 28 U.S.C. 1367(a).

## STATEMENT OF FACTS

28. Plaintiff was hired on or about December 10, 2001. [Exhibit 3: Company welcome letter explaining job offer 12/2001.]

29. Plaintiff served in the following capacities: Customer Service Representative, Customer Loyalty Specialist, Technical Support Representative, Tier I.

30. Plaintiff was hired by T-Mobile USA Inc., located at 556 Chapel Hills Drive, Colorado Springs, CO 80920 [then commonly known as Voice Stream] in December 2001, for the position of Customer Service Representative.

31. Plaintiff began employment on Monday, December 10, 2001, with an hourly wage of $12.00 per hour with benefits. [Exhibit 4: letter from 2003 explaining rate of pay and some benefits.]

32. Plaintiff performed her position within the company/at T-Mobile USA, Inc. with above-average metrics and then promoted to the position of Customer Loyalty Specialist in 2005. This position offered commission-based bonuses, and Plaintiff regularly achieved these bonuses and enjoyed her job and benefits.

33. The Plaintiff moved to the team of Lori Turner (" Lori Ann Turner / L. Turner / Turner") in 2006, where she continued to perform job duties above average and continued to achieve regular annual merit increases, quarterly and monthly bonuses. [Exhibit 5: 2007

annual performance rating showing good marks for entire year and explaining annual merit increase.]

34. Plaintiff received performance evaluations periodically. [Exhibit 6: An example of Plaintiff's metrics in 2007 showing "achieved" and "exceeded" expectations.]

35. During this seven year period, most of Plaintiff's evaluations were above average. [Exhibit 7: Metrics dated 12/28/2008 showing Plaintiff was "top performer" in comparison to peers.]

36. Plaintiff received regular bonuses and wage increases based on her comprehends merit. [Exhibit 8: compensation bonus for 2008 first quarter.]

37. Plaintiff's compensation at the time of separation was $15.32 per hour plus benefits. Quarterly bonuses and annual merit increases were provided. [Exhibit 9: compensation bonus for 2008 second quarter.]

38. Plaintiff was repeatedly commended by multiple customers. [Exhibit 10: Customer commendations; qty.17 ranging from March 2002 to December 2008.]

39. Plaintiff received annual placards for call service excellence. [Exhibit 11: Anniversary placards; qty 2 congratulating Plaintiff on "service excellence"]

40. Disability harassment, hostility, bullying, mistreatment and retaliation for Plaintiff's medical conditions, including but not limited to bipolar disorder, post traumatic stress disorder resulting from a traumatic brain injury from a motor vehicle accident.

41. The accident occurred prior to Plaintiff's hire by Defendant.

42. Defendant's conduct was the subject of internal complaints to HR and the T-Mobile internal report line for employees called the "Integrity Line." Neither of the preceding venues provided relief.

43. Upon information and belief, no "HR" representative holds any professional license subject to any regulatory authority and therefore no exhaustion of administrative remedies as to these individuals was possible.

44. Upon information and belief, HR never retained any neutral investigator.

45. HR itself as an agent of management cannot conduct any neutral investigation.

46. Upon information and belief, no misconduct complaint was made or initiated by HR or any other level of management, making the Defendant's Code of Conduct a sham as far as management accountability.  Management's action, inaction, errors, hostility and/or omissions made the work environment so intolerable that no reasonable person would tolerate, condone or countenance that work environment.  [Exhibit 12: Company code of conduct policy and standards of business conduct; 7 pgs.]

47.  Plaintiff was damaged, *inter alia,* by and through the loss of her career and benefits.

48. Defendant's conduct was provocative and exacerbated Plaintiff's disability symptoms.

49. While no statute comparable to the Children's Code or those protecting the elderly is applicable, as persuasive authority, if the Defendant's conduct had occurred in either of those venues, the offenders would have been arrested.

50. The conduct is of a nature so severe from a public policy standpoint, that it qualifies as being wrongful under the Americans with Disabilities Act and the Colorado Anti-Discrimination Act and subject to punitive remedies under the ADA.

51. In July 2007 the Plaintiff's physician, Dr. Roy Rosenthal, M.d., P.C. requested, on her behalf, FMLA (Family Medical Leave Act) accommodations be provided by her employer, the Defendant.

52. These accommodations were necessary because of symptoms arising from a TBI (Traumatic Brain Injury) that Plaintiff incurred in a car accident some years before, and she had been visiting physicians regularly for medical treatment of those symptoms.

53. Plaintiff's disorder, at the time of the request, included symptoms of bipolar disorder, PTSD (post traumatic stress disorder) and stressful episodes wherein her "incapacity (was) intermittent," according to the doctor's submitted FMLA request packet.

54. Plaintiff's FMLA allowance request from Dr.Rosenthal resulted in a reduced work schedule of 32 hours per week, and leave from work as symptoms were present.  [Exhibit 13: Dr.Rosenthal's FMLA packet and his recent letter verifying Plaintiff's diagnoses and symptoms.]

55. The harassment began, according to the Plaintiff, from September through December, 2007, when she began to suffer symptoms or episodes at work and she had to leave the environment in order to pacify, control and alleviate her symptoms, as her doctor recommended.

56. Because of the commission-based position, Plaintiff's absence from customer interaction was manifested in a loss of commission bonus money for both Plaintiff and her supervisor L. Turner.

57. Defendant's failure to adjust its commission algorithm, when a protected employee event [e.g. protect leave] was responsible for the subject loss, is *per se,* unlawful. The Defendant did adjust for a reduced schedule in hours [32 hours] but it did not adjust for episodic, intermittent FMLA excused leaves.

58. The monthly commission bonus was both dependent on the call volume taken by representatives, as well as on the result of those calls.

59. When Plaintiff started experiencing her stress-related symptoms, she had to inform her supervisor she was having an episode, and thereby excuse herself from the work environment.

60. During the preceding, in person and on the phone, the supervisor "acted out", exhibiting adverse, negative behavior conveying her disapprobation.

61. Turner would openly plead and bully, lobby and otherwise coerce Plaintiff not to leave and to instead keep working, while the Plaintiff was undergoing incapacitating symptoms and stress episodes.

62. While the preceding and similar forms of conduct were known to senior management, no adverse action was initiated against Plaintiff's offending management making Defendant's "Code of Conduct" a sham.

63. An incident occurred on November on the 7th or 14th wherein Plaintiff was experiencing an episode and informed her management via email of the preceding.

64. Turner walked to Plaintiff's station, sat on her desk and spoke to her asking her, "can't you just stay? Won't you just try and stay? We are really hurting this month." Plaintiff then showed her fingers, which were bleeding on both hands, an unpleasant symptom of the stress episodes.

65. No OSHA personal protective equipment was furnished by Defendant as required by law. [Exhibit 14: Pictures depicting injuries.]

66. Defendant was, in fact aware, of Plaintiff's bleeding which was in plain view and a subject of discussion.

67. Turner persisted however to coerce Plaintiff to continue to work and take calls, and stay on the phone.

68. "I'll see what I can do" Plaintiff told her.

69. Plaintiff did take another call, which was difficult and counterproductive for the customer, and she found it impossible to continue, so after the call she logged herself off.

70. She walked to Turner's desk and explained to her again "my levels are too high" which spurned a negative reaction from Turner in mannerism and way of speaking, in that she acting dramatically disappointed and obviously displeased; i.e exasperated.

71. This exasperated behavior from Turner was typical, whenever Plaintiff was having a stress episode and had to tell her as much.

72. It was a stressful enough time for Plaintiff already because of her symptoms but she also suffered guilt and condescension, resistance and ridicule when she had to face the supervisor to excuse herself from work.

73. A former coworker witnessed Turner's "dirty looks", scowls and frowns and recurring hostility toward Plaintiff, which became commonplace during this timeframe.

74. Plaintiff experienced an unpleasant episode on December 30th, 2007, and excused herself from work.

75. The following day Plaintiff returned to work and Turner told her she felt her condition appeared false.

76. A witness was approached by Turner wherein Turner conveyed "This is just between you and me. Turner then specifically asked: "Does [Plaintiff's] FMLA seem real to you?" casting Plaintiff in a negative light, an action of defamation.

77. Turner has no expertise, training, licensing, certification or competency to determine malingering or symptom exaggeration. Rather than enlisting professional support, Turner played amateur doctor.

78. Turner told Plaintiff that because her episodes appeared to be "adjacent to a weekend", she petitioned Janelle Beverly in HR, the representative head of FMLA, and thereby demanded Plaintiff's physician provide a written excuse for December 30' 2007.

79. However, there was in fact no pattern, as can be plainly observed through the attendance log surrounding this occasion. The conduct represented disability harassment. [Exhibit 15: Attendance record for 2007 showing no pattern of absence.]

80. Further, Plaintiff and Turner's team worked a 4-day week; therefore 50% of the shift literally did happen adjacent to a weekend.

81. Plaintiff underwent knee surgery requiring a medical leave of absence from 01/16/08 - 02/25/08. She returned to work 02/26/08 and continued to work her 10 hour shift as usual, with no FMLA leaves.

82. Plaintiff returned to work on 02/26/08 and informed Jenelle Beverly that she had returned as required, by providing her with the required "fitness for duty" letter from her knee surgeon releasing her back to work.

83. Beverly had accepted the return letter yet continued to deduct FMLA hours until 03/11/08. The hours were therefore not available to Plaintiff later in 2008 when she needed them. This was an act of fraud and constituted mischarging. The point is best understood when one considers an employee charging an employer for work time – when they are in fact on leave.

84. Upon information and belief, no misconduct investigation occurred and no discipline was administered for this misconduct.

85. Beverly also applied 20 vacation hours to days for which FMLA hours were also deducted, (01/27/2008 and 01/28/2008 using 20 hours of vacation and 20 hours of FMLA

85. Plaintiff discovered the missing hours approximately 1 year later, and called the internal whistle blower "Integrity Line."

86. The preceding hours were never calculated properly nor was the error ever corrected. [Exhibit 17: Report numbers TMO09012703 and P93287. Exhibit 18: calendars issued by Beverly in HR 09/18/09 showing in green the hours of FMLA deducted on different days, although Plaintiff was at work performing her normal 10 hour shifts 4 pgs.]

87. Note that 10 hours are deducted each work day from 02/26/08-03/10/08. [Exhibit 19: Screen shots from the scheduler showing Plaintiff's presence at work during these dates. 3pgs.]

88. The "PLOA" code applied on 02/26, 02/27, and 03/02 means "Post LOA" wherein Plaintiff was present but not logged in.

89. Plaintiff was "mentoring" or listening with other team members as a standard post-leave acclimation process which was to be paid work time

90. The misconduct, not investigated, meets the legal definition of time theft, conversion and/or civil theft. The conduct amounted to fraud by mischarging. If an employee had misrepresented their time entries, they would be fired for "time theft." The conduct is outrageous. Defendant stole time from Plaintiff.

91. This FMLA deduction can be seen on the calendars, presenting another [stolen] 20 hours

92. In sum: 100 hours were falsely deducted and never corrected – even after Defendant was told what it had done, hours relating to Plaintiff's vacation and FMLA entitlement.

93. On January 27 and 28, 2008, Defendant concurrently deducted vacation and FMLA hours and never corrected it. Because the Defendant took 80 FMLA hours and 20 vacation hours, Plaintiff did not have the subject hours available when she needed them.

94. Plaintiff actually used 379 hours in 2008, but Defendant defiantly and repeatedly, even after being told, reported 486.33 hours used.  Had Plaintiff engaged in conduct involving the misreporting of her time, she would have been fired. There were no consequences associated with Defendant's theft of these hours.

95. There were FMLA hours applied by HR at 40 per week, while Plaintiff was working normal shifts and present and accounted for at work. This accounting malpractice amounted to time theft.

96. Toward the end of March 2008 Plaintiff began experiencing symptoms again and she told her supervisor Turner that she wanted to re-apply for FMLA.

97. Plaintiff asked her supervisor to provide Plaintiff with the packet to take to her physician as she had done before.

98. Turner refused to provide the packet, and instead instructed Plaintiff to ask the manager for reduced hours, stating it would be better for commission purposes, ie. "for your saves percentage."

99. Turner then scheduled and accompanied Plaintiff to a meeting with then manager Mark Gonzales, where Plaintiff filled out the HR-issued paperwork for a reduced schedule shift accommodation instead, citing "personal reasons."

100. Plaintiff was then assigned a 32-hour per week schedule which began 04/01/08 with no leaves and no FMLA request filed.  She had been openly denied the opportunity to request

FMLA allowances, which effectively prevented her from leaving work as her symptoms arose.

100.     The Customer Loyalty Department was disbanded shortly afterward and the teams were moved laterally into a position of Technical Care Representative Tier I.

101.     During the month of August, Plaintiff, Turner and coworkers were in training for the new position of Technical Support, which occurred 07/28/08-08/28/08.

102.     Plaintiff and her coworkers were trained in a classroom setting where during any practice calls they were with partners, switching back and forth on the same login, alternating calls.

103.     The team received average statistics during training; however Turner created different and poor statistics for Plaintiff's record for the month.

104.     Plaintiff complained about this to the new Technical Support manager, Jim Nelson, several times during the following four months.

105.     Plaintiff advised Jim Nelson specifically of Plaintiff's good cause to allege that there was targeted, retaliatory mistreatment from Turner.

106.     There was neither follow-up nor resolution.  The conduct was malicious. [Exhibits 20: Letter stating statistics were "best of" or "what you earned in July"; i.e diagnostic.  Exhibit 21: Statistics showing poor stats from Turner; they were not the same as peers.]

107.     Plaintiff obtained paperwork from psychologist Dr. Dave Draxton, MA, for a new FMLA request which was submitted to Turner on 09/03/2008. [Exhibit 22: Dr.Draxton's FMLA packet.]

108.     Jenele Beverly of HR issued a calendar to Plaintiff's supervisor and manager during a meeting on 09/18/2008 wherein it was explained how the hours were available.

109.     The purpose of the calendar was to show the FMLA hours the Plaintiff had available for any future intermittent leaves.

110.     The calendar was a false record: the hours reported on the calendar as available were inaccurate.  This misinformation ultimately caused further tension with the supervisor and caused Plaintiff several unexcused absences to follow. [ Exhibit 23: HR issued Calendar dated 09/18/08]

111.     After taking leave on September 22, 2008 due to an episode, Plaintiff noticed some days following that the leave were marked as an "unexcused occurrence"

112.     Plaintiff approached HR and inquired about the preceding issue.

113.     Jenele Beverly advised Plaintiff that there was a delay in the paperwork.

114.     Plaintiff stated that the Company Physician was attempting to reach Plaintiff's physician to "finalize" the matter.

115.     Plaintiff asked Jenele Beverly what the problem was, specifically, and she stated that the company's doctor needed to have Plaintiff's doctor "state how may hours Plaintiff could work during a work week, on a reduced schedule" specifically.

116.     Once the preceding information was provided, Plaintiff's request would be approved.

117.     Plaintiff later realized that she was given incorrect information.

118.     Beverly incorrectly advised Plaintiff that which needed clarification to resolve the delay, knowing that Plaintiff understood her FMLA to allow for leaves, since she had

issued the calendar depicting available leaves to Plaintiff, supervisor and manager two

weeks earlier.

119.      Beverly also knew that Plaintiff had taken some intermittent leaves during

September through our conversations, and Plaintiff had submitted on the original

paperwork from her doctor stating that leaves were to be allowed.

Plaintiff addressed this concern to Beverly in an email. [Exhibit 24: Email explaining

Plaintiff is feeling "harassed" and "picked on" surrounding FMLA leaves.]


120. Plaintiff called Dr.Draxton and asked him to call the T-Mobile physician and to

finalize the paperwork; he was busy that Plaintiff eventually asked him to call the

company physician during Plaintiff's therapy appointment 10/02.

121. During the session, Plaintiff called the Company Physician and answered several

questions over the phone.

122. Then Dr. Draxton was sent a fax, from the Company Physician, requesting a new

accommodation which was a reduced schedule only.

123. This was to be enacted in the form of 32 hours per week, although, Plaintiff heard

him state over the phone during appointment that Plaintiff could work "32 to 34 hours a

week", the schedule of 34 hours I had told him would be okay since Plaintiff had been

keeping this schedule at work during the very time that session occurred.

124. Plaintiff was fulfilling this schedule by using her vacation time for the first part of

her shift to reduce from 10 hours per day to 8.5 hours per day.

125. The preceding is due to Plaintiff's symptoms being most often prevalent in the

morning.

126. The number of hours Plaintiff was allowed to work was misreported by the company physician, as opposed to what Dr Draxton said to him over the phone, ( detail of which can be retrieved via audio recording of the aforementioned conversation which is apparently kept at the Corporate Physician's office.)

127. In the initial paperwork, Dr Draxton requested that Plaintiff have "intermittent leave" during "episodes of incapacity", "breaks", and a "reduced schedule as necessary".

128. Dr.Draxton's requests were edited and tailored to disallow FMLA usage.  Leaves during "periods of incapacity" , and breaks, as symptoms arise, were both completely omitted and ignored from the Company Physician's edit.

129. The corporate physician did not address these parameters with Dr Draxton, although they had been initially requested with the submission 09/03/08.

130. The HR Department and company Physician altered the original request to benefit their own agenda.

131. Further, these corporate agents changed the request without Plaintiff's knowledge.

132. Plaintiff did not find this out until the next week, when more unexcused absences were applied.

133. The obvious tailoring of Plaintiff's doctor's medical recommendations is *per se* proof of the alleged statutory violations identified herein.

134. The corporate physician independently and without consent, revised Plaintiff's doctor's request, snookering her doctor to sign what he believed were his orders – later revising it after he learned of the Company's conduct.  The Company created a false record, until it was caught.   This was a violation of the Medical Practice Act by the company medical department.

135. Plaintiff discovered after she separated from the Company, that the total amount of FMLA Plaintiff actually used for 2008 was 379 hours, but HR claimed, she used 486.33 hours total.

136. In the seven years Plaintiff worked at T-Mobile, Plaintiff only requested FMLA for two 6-month periods, the second period of which was never completed.

137. On October 3, 2008  Beverly issued an FMLA approval letter citing:" This is a follow-up letter to inform you that your request for FMLA leave has been approved for [Intermittent Absence: Reduce Work Schedule to 32 hours per week Certification Period: 8/08 – 3/09." This appears that intermittent absence is approved, as verbatim. [Exhibit 25: First FMLA approval letter issued by Beverly]

138. On October 7, 2008, Plaintiff had another episode and had to stay home from work again.

139. Lori advised Plaintiff via text message that Plaintiff had better get to work, because Plaintiff was not excused for FMLA.

140. Plaintiff then informed her that there must be another error.

141. Lori advised Plaintiff to call the Team Manager and explain herself for being absent.

142. There were further texts between the parties as she demanded that Plaintiff go to work.

143. Defendant advised Plaintiff that she was unexcused.

144. There is a text message Plaintiff sent to her this day (one of several times Plaintiff complained about the harassment)

145. Plaintiff "harassed" over her FMLA needs, and that it may be necessary to bring in a higher "legal authority". [Exhibit 26: Text message stating Plaintiff feeling "harassed" and felt need to contact a "legal authority".]

146. Plaintiff has photographic evidence concerning bloody fingers showing how stress levels were amplified that day. [Exhibit 27: Injuries from stress resulting from Turner and staff on this date.]

147. Plaintiff then called Jim Nelson, her manager, and left him a detailed voicemail explaining that there must be an error, and that Plaintiff had a severe auto wreck, a head on collision, and that Plaintiff has a plastic eye socket etc. from it and suffers from symptoms related to head trauma.

148. Plaintiff told him she would ask her doctor to rectify the error as soon as possible so that he need not worry, and that Plaintiff hoped no disciplinary action would be taken against her.

149. Plaintiff called HR and spoke with Jenele Beverly this day and she stated that my doctor had "signed off" on a statement advising that "[Plaintiff] was only allowed a reduced schedule" and that she was looking at it as we spoke on the phone.

150. She failed to mention that the document signed off on was not created by Plaintiff's doctor – but by the Company. This amounted to dirty tricks. [Exhibit 28: initial fax to Draxton containing Company omissions.]

151. Plaintiff advised her that Plaintiff's original paperwork was edited and ignored, and that her doctor had originally signed off on intermittent leaves as necessary.

152. Why Beverly did not advise and clarify the change when she issued the FMLA packet cited above was misconduct. [Exhibit 29: Initial letter issued by Beverly]

153. The Defendant engaged in misconduct, importuning Plaintiff 's doctor to make a statement contrary to what the doctor told Plaintiff and which the doctor ultimately corrected.

154. Jenele Beverly gave the calendar to Turner.

155. Turner took Plaintiff to a meeting with Jim Nelson and stated that intermittent leaves were available as depicted on the calendar.

156. Turner conveyed the following message: that intermittent leave hours were available, when in fact they were not.

157. Neither Plaintiff nor her supervisor nor her managers were apprised that Leaves had been edited from the FMLA parameters, until Plaintiff was having a serious episode.

158. Plaintiff frantically called Dr.Dave several times that day, leaving him voicemails pleading with him to call the company physician back to clarify, referring to his original packet of FMLA parameters requested which Plaintiff had submitted 09/03/08)

159. Dr.Dave contacted the Company Physician and had them rectify the FMLA request, referencing my original paperwork, from 09/03/08 so as to include "intermittent leave" during "episodes of incapacity."

160. Beverly issued Plaintiff's revised packet on October 10, 2008 (see attached) stating:

"[Intermittent Absence; Reduced Work Schedule to 32 hours per week; In addition, will need up to 5 days per month] Certification Period: 9/3/08 - 3/3/09]." The report also goes on to state "Please note that you are allowed to use no more than 12 work weeks ([480 hours]) of FMLA leave total in a rolling backward 12-month period for qualifying conditions. As of [10/3/08], you have used [442.17] hours of FMLA leave. It is your responsibility to keep track of your FMLA usage." (The only way to track FMLA hours

is from the information provided through HR) [Exhibit 30: Second letter from Beverly.]

161. Plaintiff was harassed by her supervisor and told to explain herself to her manager, and that her FMLA leaves were unexcused, b/c of the HR and company physicians editing and engaging in a disinformation undertaking with Plaintiff 's doctor.

162. Plaintiff's doctor requested breaks; Defendant dishonored the request.

163. Defendant has contended that every assertion by it is correct and that every assertion of Plaintiff is a lie. This is T-Mobile. [Exhibit 31: Chart showing false information issued by Company and its processes.]

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

AMERICANS WITH DISABILITIES ACT

Each and every paragraph above is incorporated herein by reference in their entirety and as if first stated.

Plaintiff is a disabled person in accordance with the Act's definition.

Plaintiff sought accommodation

Plaintiff did not receive accommodation including but not limited to adjusted work schedules as authorized by both the ADA and the FMLA.

Defendant at no time undertook an interactive discussion.

Defendant's meetings were administrative and disciplinary in nature, lodging complaints,

criticisms and exhibiting generally adverse behaviors.

Plaintiff was harassed by management including but not limited to record tampering and

spoliation, theft and fraud.

Plaintiff repeatedly complained about her mistreatment,

Plaintiff was damaged by Defendant dishonoring the legal requirements of the Americans with

Disabilities Act.

## SECOND CLAIM FOR RELIEF

## FAMILY AND MEDICAL LEAVE ACT

Each and every paragraph above is incorporated herein by reference in its entirety and as if first

stated.

Plaintiff was a full time employee

Plaintiff was employed for more than one year.

Plaintiff satisfied the hours requirement of the FMLA

Plaintiff had a serious health condition.

Plaintiff required protected leave.

Plaintiff's leave and medical records were misrepresented, fabricated, altered, tampered with and

distorted by company personnel – until Plaintiff caught the conduct and caused its correction.

FMLA breaks, authorized by Plaintiff's treating physician, were dishonored.

Some records, after errors were detected by Plaintiff, were corrected, some were not.

Defendant failed to communicate a modification in Plaintiff's entitlement to FMLA leave,

placing her employment in jeopardy.

The attendance record for the last half of 2008 was uncorrected at the time Plaintiff separated.

Some records while corrected, were allowed to persist as a basis for adverse attendance

conclusions. As a result, Plaintiff could not move to different teams or obtain merit increases.

Defendant is a sophisticated employer with full time human resources, audit and legal staffs.

It cannot assert inadvertence.

Defendant cause Plaintiff's separation and damaged her while employed.


THIRD CLAIMS FOR RELIEF

BREACH OF CONTRACT


Each and every paragraph above is incorporated herein by reference in its entirety and as if first

stated.


Defendant requires employees, as a non-negotiable term and condition of employment, to agree

to abide by its mandatory policies and procedures.

Both parties were competent to contract, possessed of capacity to contract and aware of the

consideration for the contract at the time the contract was actualized.

Plaintiff abided by these policies and procedures.

Defendant's agents did not as more particularly described herein.

*Inter alia,* Defendant defied its various requirements, engaged in theft, conversion and misappropriation of Plaintiff's property [wages], all in derogation of Plaintiff's policies and procedures, further failing to warn Plaintiff that certain agents of Defendant did not have to comply with the subject policies.

As a result, Plaintiff was damaged.

## FOURTH CLAIM FOR RELIEF

## PROMISSORY ESTOPPEL

Each and every paragraph above is incorporated herein by reference in its entirety and as if first stated.

Defendant's agent Jim Nelson promised Plaintiff repeatedly that the days which were to have been excused but were marked unexcused, would be corrected.

These days were not corrected.

As a result, plaintiff who was in need of leave, had her leave entitlements compromised by Nelson's dishonor of his promise.

Nelson's conduct prevented Plaintiff from moving within the Company and receiving no merit increases/bonuses.

Nelson never apologized.

As a result, Plaintiff was damaged.

## FIFTH CLAIM FOR RELIEF

## WRONGFUL DISCHARGE AS AGAINST PUBLIC POLICY

Each and every paragraph above is incorporated herein by reference in its entirety and as if first stated.

Plaintiff, due to Defendant's administrative rampage of lawlessness, defying federal law, engaging in theft of Plaintiff's time entitlements said claim not cognizable under Colorado's Wage Claim Act, altering medical records and its agents conducting themselves in derogation of the Company's [meaningless] allegedly obligatory, policies and procedures, [Plaintiff learning of their meaninglessness after the fact], caused Plaintiff's loss of employment as no reasonable person could or would tolerate what amounted to a free-for-all or an authentic commercial "animal house" environment.

None of the preceding are protected under the business judgment rule or the at will doctrine in that at will does not equate to "anything goes", although Defendant conducted itself as if it were immune from any accountability.

None of the "HR" personnel hold any professional license requiring personal, professional accountability.

The "HR" personnel responsible in large part for the subject lawlessness are "professionals" only for purposes of being exempt from overtime.

Upon information and belief, the Defendant's audit and legal departments, undertook no oversight, monitoring, testing, surveying or competency assessments of any "HR" agents as contemplated under ISO, quality, Federal Sentencing Guidelines, jury instructions related to punitive conduct or other standards, defaulting to a "management by complaint" model.

The preceding lack of oversight, itself, states a claim for misconduct against those departments who managed "HR" on a nonfeasance standard.

As a result, Plaintiff was damaged.

DAMAGES

Plaintiff seeks:

Back pay.

Front pay.

Compensatory/special damages.

Consequential damages.

Liquidated damages

.

Federally authorized punitive damages.

Other damages allowable as exemplary upon hearing by this Court.

Prejudgment, post judgment and prejudgment on post judgment interest.

All costs of collection including attorneys' fees.

Attorneys' fees for the bringing of this action.

Costs including filing, investigative deposition and expert fess, inter alia.

All social security, tax adjustments and tax preparation costs to adjust for unpaid back taxes.

Plaintiff demands a trial by jury.

Respectfully submitted this 25 day of June 2010,


Jane Doe

## Exhibits

Plaintiff: Jane Doe

Defendant: T-Mobile USA Inc.

29 U.S.C. 2601 et seq., 42 U.S.C. 12111 et seq.

Americans with Disabilities Act, Family and Medical Leave Act

1) Statistical print out of 2008 quarter three metrics showing uncorrected absenteeism; print date 01/06/2009.

2) Charges submitted to the DORA and EEOC in April 2009.

3) Company welcome letter explaining job offer dated 12/2001.

4) Letter from 2003 explaining rate of pay and some benefits.

5) 2007 annual performance rating showing good marks for entire year and explaining annual merit increase.

6) An example of Plaintiff's metrics in 2007 showing "achieved" and "exceeded" expectations.

7) Metrics dated 12/28/2008 showing Plaintiff was "top performer" in comparison to peers.

8) Compensation bonus for 2008 first quarter

9) Compensation bonus for 2008 second quarter.

10) Customer commendations; qty.17 ranging from March 2002 to December 2008.

11) Anniversary placards; qty 2 congratulating Plaintiff on "service excellence"

12) Company code of conduct policy and standards of business conduct; 7 pgs

13) Dr.Rosenthal's FMLA packet and his recent letter verifying Plaintiff's diagnoses and symptoms.

14) Pictures depicting injuries.

15) Attendance record for 2007 showing no pattern of absence

16) Schedule showing deduction of vacation time and calendar showing deduction of FMLA time 01/27/08 and 01/28/08 resulting in 40 total hours

17) Report numbers TMO09012703 and P93287

18) Calendars issued by Beverly in HR 09/18/09 showing in green the hours of FMLA deducted on different days, although Plaintiff was at work performing her normal 10 hour shifts 4 pgs

19) Screen shots from the scheduler showing Plaintiff's presence at work during these dates, showing "PRETO" or vacation time used for 01/28/08 and 01/29/08, for which FMLA was also deducted.  3pgs.

20) Letter stating statistics were "best of" or "what you earned in July"; i.e diagnostic.

21) Statistics showing poor stats from Turner.

22) Dr.Draxton's FMLA packet

23) HR issued Calendar dated 09/18/08

24) Email explaining Plaintiff is feeling harassed and picked on surrounding FMLA leaves.

25) First FMLA approval letter issued by Beverly

26) Text message stating Plaintiff feeling "harassed" and felt need to contact a "legal authority".

27) Photos of injuries from stress resulting from Turner and staff on this date.

28)  Initial fax to Draxton containing Company omissions.

29)  Initial letter issued by Beverly.

30) Second letter from Beverly

31) Chart showing false information issued by Company and its processes.