IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-01506-MSK-BNB

JULY L. PERU,

       Plaintiff,

v.

T-MOBILE USA, INC.,

       Defendant.

_____

**OPINION AND ORDER GRANTING,
IN PART, MOTION FOR SUMMARY JUDGMENT**
_____

     **THIS MATTER** comes before the Court pursuant to the Defendant's Motion for Summary Judgment **(# 101)**, Ms. Peru's response **(# 117**, as supplemented **# 123-127)**,[1] and the Defendant's reply **(# 121)**; Ms. Peru's Motion to Strike **(# 105)** Exhibit A from the Defendant's summary judgment motion, the Defendant's response **(# 113)**, and Ms. Peru's reply **(# 115)**; and the Defendant's Motion to Restrict Access **(# 111)** to Exhibit B to its summary judgment motion, to which no opposition was filed.

_____

     [1]Ms. Peru filed her substantive summary judgment response **(# 117)** on January 10, 2012, and T-Mobile filed its reply on January 24, 2012. Approximately, two weeks after T-Mobile's reply, Ms. Peru filed a "Notice" **(# 123)** seeking to correct certain typographical errors in the identification of two exhibits. Simultaneously, she filed a second "Notice" **(# 124)** that stated that she "attempted to file her brief in support of her response to the Defendant's motion for summary judgment as of 2/10/12," but that the Court's electronic filing system "would not permit the brief to be filed." She thus "requested the Court to accept the brief on Monday 2/13/12." On February 13, 2012, Ms. Peru filed a

**FACTS**

The Court will briefly summarize the facts here and elaborate as necessary as part of its analysis. In doing so, the Court construes disputed facts most favorably to the non-movant.

Ms. Peru was employed by Defendant T-Mobile USA, Inc. ("T-Mobile") in various customer service positions between 2001 and 2009. Ms. Peru suffers from a disability, and contends that beginning in 2007, T-Mobile representatives engaged in a campaign of "harassment, hostility, bullying, and mistreatment" of her because of her condition. In July 2007, at the urging of her doctor, she sought an accommodation in the form of a 32-hour work week and the right to take intermittent leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, but contends that T-Mobile failed to accommodate her reduced schedule or permit her additional needed leave. Ms. Peru sought certain promotions within T-Mobile, but was not selected for the positions, a result she attributes to improper recordkeeping and statistical adjustments by T-Mobile because of her reduced schedule or simply due to discrimination by her supervisor. In or about early 2009, citing continuing harassment by her supervisor and unresolved discrepancies relating to her leave time, Ms. Peru resigned her employment.

According to her *pro se* Amended Complaint (**# 12**), Ms. Peru asserts five claims for relief: (i) violation of the Americas With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., apparently under both failure to accommodate and disparate treatment theories; (ii) violation of the FMLA in various respects; (iii) common-law breach of contract, apparently under Colorado law, relating to T-Mobile's failure to comply with its own policies prohibiting "theft, conversion and misappropriation of [Ms. Peru's] property" in the form of wages; (iv) promissory estoppel,

apparently under Colorado law, in that T-Mobile had advised her that certain inaccuracies in her attendance record would be fixed but never were, thus impeding her ability to receive promotions; and (v) wrongful discharge in violation of public policy under Colorado law, in that T-Mobile engaged in "theft of Plaintiff's time entitlements, . . . altering medical records," and violating its own internal policies.

## ANALYSIS

### A.  Preliminary matters

There are several matters that must be untangled before the Court can move to consideration of the substantive issues presented.

#### 1.  Documents before the Court

First, the Court must address to which of Ms. Peru's filings are properly before the Court. Ms. Peru filed her substantive summary judgment response (# 117) on January 10, 2012.  That brief presented substantive argument on her claims and referenced a variety of exhibits.  Ms. Peru attached some of the referenced exhibits to her filing, but many more were addressed in the text of the brief in conjunction with a request for leave to file those motions under seal, along with argument as to why each exhibit should be sealed.  The exhibits subject to this request were not filed under provisional restriction; indeed, they were not filed until some significant time later, as discussed below.

Ms. Peru's request to restrict access (the preferred term, now that technology has rendered the colloquial term "sealed" somewhat archaic) to certain exhibits as part of her motion violates two separate local rules.  First, D.C. Colo. L. Civ. R. 7.1(C) provides that "a motion shall not be included in a response or reply to the original motion.  A motion shall be made in a

separate paper." Ms. Peru did not file her request to restrict access to the documents in a stand-alone motion, separate from her summary judgment response. Second, D.C. Colo. L. Civ. R. 7.2 provides the mechanism by which parties may move for leave to file documents under restricted access. Subsection (D) of that rule provides that a party seeking to restrict access to a document "may[2] [file that document] as a restricted document," where it will remain subject to restriction until the Court rules on any accompanying motion to restrict access. (The rule also provides that a filing under provisional restriction, if not accompanied by a motion to restrict access, shall have its restrictions lifted automatically after 14 days.) Ms. Peru did not file the exhibits for which she sought to restrict access simultaneously with her response.

Ms. Peru filed none of the documents that she wanted considered under restriction with or immediately after filing her summary judgment response. T-Mobile filed its reply in support of the summary judgment motion on January 24, 2012. Approximately two weeks later, on February 11, 2012, Ms. Peru filed two "Notices". The first **(# 123)** sought to correct two typographical errors in references to exhibits in her previously-filed response. The second **(#124)** stated that she "attempted to file her brief in support of her response to the Defendant's motion for summary judgment as of 2/10/12," but that the Court's electronic filing system "would not permit the brief to be filed." She thus "requested the Court to accept the brief on Monday 2/13/12." On February 13, 2012, Ms. Peru filed a document described as "a brief

---

[2]The term "may" in this rule is the permissive "may," not the optional "may." In other words, the rule permits parties to provisionally file the document under restricted access, rather than forcing them to file the document publicly until the motion is resolved. The Court does not read the rule to give the filing party the **option** to withhold the document until the motion for leave to file under restriction is ruled upon. In most circumstances, the Court cannot make an informed decision as to whether restriction is appropriate without being able to view the document itself.

containing those exhibits Plaintiff petitioned to file under seal" in her prior response. This "brief" also included descriptions of each of the attached exhibits, as well as some limited degree of argument regarding some of them.

The Court is mindful of Ms. Peru's *pro se* status, and accordingly, reads her pleadings liberally. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). However, such liberal construction is intended merely to overlook technical formatting errors and other defects in Ms. Peru's use of legal terminology and proper English. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). *Pro se* status does not relieve Ms. Peru of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court will treat her according to the same standard as counsel licensed to practice law before the bar of this Court. *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

The Court first turns to the issue of Ms. Peru's failure to file all of her relevant exhibits as part of her summary judgment response. She neither sought nor obtained leave of the Court to defer the filing of some of her exhibits. T-Mobile addressed the withheld exhibits in footnote 2 of its summary judgment reply, stating that it "is not able to respond completely to the withheld exhibits," and that it "seeks to preserve its ability to file a sur-reply should Ms. Peru be allowed to put additional evidence before the Court that was not included with her response." The Court notes, however, that Ms. Peru's February 2012 filing of her exhibits under provision restriction was done at restriction level 1, allowing T-Mobile the ability to review the documents, and T-Mobile did not thereafter request leave to file a sur-reply addressing the newly-tendered exhibits. Therefore, although the Court finds Ms. Peru in violation of the Local Rules by not filing all of

her exhibits promptly, the Court nevertheless finds that T-Mobile was not prejudiced by that violation.  The Court therefore considers the additional exhibits tendered by Ms. Peru in February 2012.  The Court will not consider, however, any additional argument contained in Ms. Peru's "brief" (**# 125**) submitted in February 2012, as Ms. Peru neither sought leave to amplify her prior arguments, nor does the Court find good cause for such amplification.

2. <u>Exhibits subject to restricted access</u>

Next, the Court considers whether the tendered exhibits should be restricted from public scrutiny.  Although Ms. Peru's request to restrict access to those exhibits in her summary judgment response violated Local Rule 7.1(C), the Court will nevertheless treat those requests as a properly-submitted motion to restrict access under that Rule and evaluate it accordingly.

Under Local Rule 7.1(B), the party seeking to restrict access to a document must, at a minimum, identify the injury that will result if access is not restricted, address how that injury outweighs the strong public interest that exists in having access to court records, and explain why no alternative to restricted access (such as redaction, summarization, stipulation, or partial restriction) is sufficient.  Such a showing is necessary in order to overcome the common-law right of the public to have access to judicial records, *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978), and the powerful public interest in having documents considered during the judicial process be available for public inspection. *United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997).

Having reviewed the reasons given by Ms. Peru for seeking to restrict access to the exhibits she has submitted, the Court finds that she has failed to carry her burden of showing that the risk of injury to her from public disclosure outweighs the public interest in monitoring the

functioning of the judicial system with regard to most of the exhibits she has submitted.  Many of those exhibits, such as T-Mobile e-mails and forms regarding her application for and approval of FMLA leave, implicate her medical privacy in relatively minor respects, and where such exhibits are more explicit, they entail matters that go to the heart of the case, making the public interest in being able to review them in order to judge the correctness of this Court's analysis particularly strong.

However, there is a handful of exhibits that address Ms. Peru's medical condition with a degree of particularity that elevates the potential injuries she would suffer were they to be publicly disclosed, and that the issues that the records are not necessary to resolve the issues because the facts reflected in them are not in dispute.  In particular, her exhibits A, B, and U are physicians' notes specifically identifying the nature of her disability, potentially exposing her to ridicule or stigma if disclosed.  For purposes of summary judgment, T-Mobile has conceded that Ms. Peru suffers from a cognizable disability (for ADA purposes) and a serious health condition (for FMLA purposes), and thus, the Court is not called upon to make any determinations regarding the existence or severity of Ms. Peru's disability.  The public interest in access to court records exists largely as a check on the Court's decision-making power, and where the Court is not considering the substantive merits of uncontested issues, the public's interest in access to those records is relatively small.  *See Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 755 (10th Cir. 2009) (unpublished).   Accordingly, the Court finds it appropriate to continue a level 1 access restriction on Exhibits A, B, and U, only.

T-Mobile has also moved **(# 111)** to restrict access to Exhibit B to its summary judgment motion.  Exhibit B consists of approximately 25 pages of excerpts from Ms. Peru's deposition.

T-Mobile argues that the excerpts implicate Ms. Peru's privacy with regard to her medical condition.  (Ms. Peru apparently concurs, although she did not file a response to the motion elaborating on T-Mobile's arguments.)

Having reviewed the exhibit, the Court disagrees.  The partial transcript addresses Ms. Peru's medical issues only in the context of the particular workplace events that give rise to the claims herein; it does not mention her medical condition in the abstract nor otherwise contain private material unrelated to the issues before the Court.  Accordingly, the public interest in being able to review the materials this Court considers in ruling on contested issues outweighs the minimal privacy interests Ms. Peru has in avoiding public disclosure of the relatively benign references to her medical condition in the excerpts.  Thus, T-Mobile's motion to restrict access is denied.  The exhibit was not provisionally sealed at the time of filing and thus, nothing needs to be done to preserve its publicly-available character.

3. T-Mobile's Exhibit A

Exhibit A to T-Mobile's motion is an acknowledgment page reflecting Ms. Peru's acceptance of certain policies stated in T-Mobile's employee handbook.  T-Mobile relies upon this acknowledgment page in support of its motion as discussed below.  Ms. Peru has moved (**# 105**) to strike that exhibit, arguing that T-Mobile never provided her with a copy of it during discovery.  The Court finds it unnecessary to address the issue in particular detail, as Ms. Peru admits that she was shown the document and discussed it during her deposition, and she was provided with a copy of the document on November 11, 2011, after the close of discovery but before T-Mobile's summary judgment motion was filed.  Ms. Peru does not contend that the document is inauthentic, nor identify any other prejudice that she has suffered from any failure

of T-Mobile to provide it earlier.  Accordingly, the Court denies Ms. Peru's motion and considers T-Mobile's Exhibit A.

>4. <u>Ms. Peru's evidence</u>

Finally, the Court turns to the question of how it should assess Ms. Peru's evidence.  Ms. Peru's summary judgment response is somewhat disorganized, repetitive, and conclusory.  This makes it difficult to derive a meaningful chronology of the events or to fully understand her factual contentions.  In addition, she cites to exhibits in support of certain contentions, but the material she cites to fails to fully support the allegations she makes.  She makes several representations that unnamed "witnesses" will corroborate her allegations, but fails to attach affidavits or deposition testimony from those witnesses.

As noted above, the Court is cognizant of Ms. Peru's *pro se* status and liberally construes her filings, but also holds her to uniformly-applicable rules of evidence, procedure, and substantive law.  In this regard, the Court turns to Ms. Peru's Exhibit V for an overall chronology and general identification of the particular events that Ms. Peru deems most significant.  Exhibit V is not verified under penalty of perjury but the Court is satisfied that were Ms. Peru to be permitted to remedy such defect, she would do so.  Thus, the Court treats the contents of Exhibit V as an affidavit from Ms. Peru, attested to pursuant to 28 U.S.C. § 1746. The Court emphasizes that it considers only the factual recitation in Exhibit V, not the statutory citations or other legal argument contained therein.  In addition, the chronology itself contains many conclusory assertions that the Court does not accept.  Nevertheless, Exhibit V provides the most comprehensible roadmap to Ms. Peru's factual contentions.

The Court has also considered Ms. Peru's factual contentions to the extent she has

pointed the Court to specific testimony from her deposition or other properly-submitted

materials, and the Court's discussion herein reflects as much, but the Court has declined to credit

allegations in her response that are utterly conclusory.

**B. Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### C.  T-Mobile's motion

The Court addresses the claims in the order raised in T-Mobile's motion.

### 1.  Breach of contract and promissory estoppel claims

During the course of this case, Ms. Peru's breach of contract and promissory estoppel claims morphed from their original presentation.  In her Amended Complaint, the breach of contract claim was premised on T-Mobile's noncompliance with certain leave policies, and that as a result, it "engaged in theft, conversion, and misappropriation of . . . wages."  The promissory estoppel claim was based on allegations that a T-Mobile agent "promised Plaintiff repeatedly that the days which were to have been excused but were marked unexcused would be corrected," and that the failure to do so resulted in Ms. Peru's "leave entitlements [being] compromised" and her "receiving no merit increases."

In Ms. Peru's summary judgment response, however, she describes these claims very differently.  She states that her  breach of contract claim and promissory estoppel claims are "based upon the promise that T-Mobile set forth to its employees that it would obey anti-harassment and anti-discrimination laws" that are "set forth by United States Federal Statutes." She states that she expected T-Mobile "to uphold the federal, state, and local law by abiding its own anti-harassment and anti-discrimination policies."  Her response does not contend that these claims are based on T-Mobile's failure to comply with any other corporate policies.  The Court construes the claims consistent with Ms. Peru's description of them in her summary judgment response on the assumption that developments in discovery or sharpening of the issues has caused her to refine the claims in the pleadings to their present form.

The Court has some doubt that a claim for breach of contract or promissory estoppel can lie where the only promise allegedly breached is a promise to comply with federal anti-discrimination law.  Such claims are logistically problematic for several reasons.  First, they necessarily require proof of the substantive violation of the anti-discrimination law in order to demonstrate the breach of the promise, making them redundant of the statutory claim.  (Indeed, the measure of damages for the breach of contract would essentially be the damages recoverable under the statute.)  In addition, each statutory claim has carefully-drafted enforcement and remedial schemes that would be bypassed by a common-law claim sounding in contract or quasi-contract.  *See e.g. Cavin v. Honda of America Mfg., Inc.*, 138 F.Supp.2d 987, 992-93 (S.D.Oh. 2001) (dismissing state wrongful discharge claim premised completely on violations of FMLA).  Thus, it appears to the Court that a contract or quasi-contract claim premised on a promise not to violate federal anti-discrimination law is effectively subsumed by the statutory claim itself and is

not separately cognizable.

If the claims were cognizable, however, the Court would grant summary judgment to T-Mobile on them based on Ms. Peru's at-will status.  In general, employment is Colorado is at-will, and an employer may enact, modify, eliminate, or disregard its corporate policies without notice to the employee.  However, Colorado law recognizes a limited set of circumstances where employment policies and handbooks can create an implied contract if the circumstances indicate that the employer manifested a willingness to be bound by the terms of that policies and the employee relied on the policies to her detriment.  *Anderson v. Regis Corp.*, 185 Fed.Appx. 768, 771 (10th Cir. 2006) (unpublished), *citing Frymire v. Ampex Corp.*, 61 F.3d 757, 769 (10th Cir. 1995).  However, the employer may prevent policies and handbooks from having any contractual effect by issuing a clear and conspicuous disclaimer to that effect.  *Id.*

T-Mobile contends that it issued just such a disclaimer in this case, and attaches a copy of it.  The disclaimer, signed by Ms. Peru on December 1, 2001, states (among other things):

> I understand that the information contained in the Handbook constitute management guidelines only, which may change from time to time, or be modified or disregarded in the Company's discretion.  I recognize that neither the manual nor any other communication . . . is intended to in any way create an employment contract or other contract of any kind, express or implied.  I understand that nothing in this Handbook creates a specific promise of specific treatment under any certain set of circumstances; to the contrary, I know that [T-Mobile] has full management discretion to implement, apply, interpret, modify, or disregard the guidelines in this handbook.

Ms. Peru does not dispute that she received and signed this disclaimer, nor does she argue that the disclaimer was in any way unclear, misleading, or subject to any exception.  In fact, Ms. Peru's response does not address the disclaimer at all.  Nevertheless, the Court finds

that this language clearly and unambiguously advises employees that T-Mobile's statements of policies may be "modified or disregarded" at any point, purely at T-Mobile's discretion. Accordingly, such policies cannot amount to a promise enforceable in either contract or quasi-contract. T-Mobile is therefore entitled to summary judgment on Ms. Peru's breach of contract and promissory estoppel claims.

2. <u>Wrongful termination in violation of public policy</u>

Colorado recognizes a limited exception to at-will employment insofar as an employee who is discharged in violation of a clearly-established public policy may challenge her termination. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992). To establish such a claim, an employee must show: (i) the employer directed the employee to perform an illegal act or prohibited the employee from performing a public duty or exercising an important privilege; (ii) the action directed or prohibited implicated a specific statute relating to public health, safety, or welfare or undermined a clear public policy; (iii) the employee was terminated for refusing to perform the act or forego the privilege; and (iv) the employer was aware that the employee reasonably believed that the act directed or the prohibition imposed was unlawful. *Id.* However, Colorado does not permit wrongful discharge claims premised on public policy where the public policy is embodied in a federal anti-discrimination statute containing its own remedial scheme. *See e.g. Krauss v. Catholic Health Initiatives Mountain Region*, 66 P.3d 195, 203 (Colo. App. 2003) (no wrongful discharge claim where public policy allegedly violated was failing to comply with FMLA).

Once again, Ms. Peru's response articulates her position somewhat differently than does the Amended Complaint. For the reasons stated earlier,  the Court is guided by her position in

her response.  There she states that the public policy she invokes is "public policy regarding harassment and discrimination with regard to the employee's rights or privileges as a worker governed by United States law."  Both the ADA and FMLA provide remedies for employees who claim to have been harassed or discriminated against due to their protected status under those laws, and thus, Ms. Peru's wrongful discharge claim cannot rely upon those public policies for support.  Ms. Peru does not address any other public policy that supports her wrongful discharge claim, and thus, T-Mobile is entitled to summary judgment on that claim.

3.  <u>ADA claims</u>

The Court understands Ms. Peru to allege violations of the ADA is as many as three respects: (i) failure to accommodate, (ii) disparate treatment, and (iii) hostile environment harassment.

A.  <u>Failure to accommodate</u>

In general, an employee bringing a claim of discrimination under the ADA must show: (i) that she is disabled within the meaning of the statute; (ii) that she is able to perform the essential functions of her job, with or without reasonable accommodation; and (iii) that the employer discriminated against her because of her disability.  *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1249 (10th Cir. 2004).

The ADA provides that an employer is obligated to make any "reasonable accommodations" that may be necessary in order to permit a qualified disabled employee with the ability to perform the essential functions of the job.  42 U.S.C. § 12112(a) (defining "discrimination" under the ADA to include "not making reasonable accommodations"); *see generally Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1160-61 (10th Cir. 1999) (describing

ADA statutory scheme).  When a claim of discrimination contends that the employer failed to accommodate the employee's disability, the employee must demonstrate the existence of a facially reasonable accommodation; the burden then shifts to the employer to demonstrate that it was unable to provide that accommodation within the terms of the ADA.  *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1264 (10th Cir. 2009).

### 1.  Reduced schedule and increased breaks

Ms. Peru contends that she made several requests for accommodation from T-Mobile, dating back to 2007.  The record is not entirely clear on what accommodations were requested at what times.  Those portions of Ms. Peru's deposition submitted by T-Mobile address the issue in only a fragmented and incomplete way.  The record contains no meaningful information that specifically identifies the dates and content of her requests.

It appears, however,  that on various occasions beginning in July 2007, Ms. Peru made a request that T-Mobile accommodate her by allowing her to work a 32-34 hour per week schedule and to permit her to take "intermittent leave" in the form of "short term and longer term breaks" as her symptoms warranted.  *See e.g.* Docket # 117, Ex. V, p. 2; Docket # 125, Ex. C.  Ms. Peru appears to concede that T-Mobile granted her request by shortening her schedule, but she alleges that T-Mobile "edited" her doctors' requests to remove references to being allowed to take short- and long-term breaks.  It is unclear what form this "editing" took – Ms. Peru offers no evidence that T-Mobile ever disputed that she had requested the ability to take additional breaks – nor is the Court directed to evidence in which Ms. Peru contends that she was prevented from taking breaks (*c.f.* leave, as discussed below) when she requested.  Accordingly, the Court finds that Ms. Peru has failed to demonstrate a genuine issue of fact with regard to her contention that T-

Mobile failed to accommodate her request for a reduced schedule and intermittent breaks.

### 2.  FMLA leave

It is undisputed that T-Mobile granted Ms. Peru the opportunity to take intermittent leave time pursuant to the FMLA, although a persistent complaint of Ms. Peru's is that T-Mobile persistently mis-accounted for her use of such time.  It is not clear whether Ms. Peru's failure to accommodate claim under the ADA encompasses the alleged mishandling of her FMLA leave, or whether that contention is asserted only as an FMLA violation.  As the Court discusses below, it concludes that Ms. Peru has demonstrated a triable issue of fact as to whether T-Mobile interfered with or prevented her from using FMLA leave to which she was entitled.  To the extent she asserts that the failure to provide such leave also constitutes a failure to accommodate her under the ADA, that claim survives to the same extent and for the same reasons.

### 3.  Modification of compensation scheme

Ms. Peru also seems to allege that T-Mobile failed to accommodate her by not restructuring its compensation formula to account for her reduced hours.  The record with regard to this contention is thin. Ms. Peru contends that she was paid according to a formula that compared the number of "lines touched" by the employee as customer service representative (which the Court understands to mean the number of different customer accounts addressed by the employee during the workday) and the number of contract renewals that the employee was able to achieve on those lines.  Exhibit I to Ms. Peru's response, consisting of an excerpt of Ms. Peru's deposition, is the clearest discussion of that policy:

> . . . the commission that representatives have in that department
> [is] based on the number of calls they take versus the number of
> contracts they extend.  Save percentage is the number of . . .
> contracts the representative gets versus the number of cancels, I
> believe.  That percentage, the commission-based percentage,
> depended upon call volume.  And they don't have an adjusted
> algorithm, where if people take FMLA leave it adjusts for that
> commission[. T]hey do have it so that if people are on 32 hour
> weeks they don't have to hit as many lines to reach X bonus so that
> is an equation that's inserted there.  But for actual leaves from
> work on FMLA accommodations there is no adjustment.  So my
> having taken leave the previous semester, if you will, the last half
> of 2007, was hurting my commission, but also Lori Turner [Ms.
> Peru's supervisor's] commission, and the team commission
> because there was no adjustment for the leaves.  It was just a
> whole day of missed calls.

The record does not reflect when Ms. Peru requested an accommodation in the form of
modification of the compensation formula, nor what her request entailed.  The excerpt quoted
above does appear to indicate that Ms. Turner suggested that Ms. Peru use personal leave
(apparently instead of FMLA leave) to address the issue, noting that using personal leave would
"help your saves percentage."  Ms. Peru states that she understood Ms. Turner's reasoning, but
"didn't think that it sounded right."

Neither does T-Mobile's reply shed much additional light on the issue.  It does not, for
example, describe the compensation scheme or the nature of Ms. Peru's requests and T-Mobile's
responses regarding it.  Rather, it simply points out that, as a matter of company policy, all
medical-related leaves of absence are unpaid, although this contention is not consistent with the
exhibit that T-Mobile cites in support.[3]

---

[3]Exhibit E to its reply is a portion of T-Mobile's employee handbook that states, among
other things, that "Medical leave is generally unpaid."  (Emphasis added.)  The exhibit does not
elaborate on the exceptions to that "general" rule.

T-Mobile argues that the ADA "does not require that an employee who takes leave be compensated the same as she would have been if she had not taken leave; indeed the ADA does not require that an employee on leave be compensated at all." *Citing* 29 C.F.R. Part 1630 appx., § 1630.2(o). The Court finds this single citation not on point. The cited document is the Equal Employment Opportunity Commission's ("EEOC") Interpretive Guidance memorandum on the application of the ADA, and the cited section discusses the concept of "reasonable accommodations." It notes that the EEOC's formal regulations list "the most common types of accommodation that an employer . . . may be required to provide," and goes on to state that "There are any number of other specific accommodations that may be appropriate for particular situations but are not specifically mentioned in [the formal regulation]." As examples, it notes that "other accommodations could include . . . permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment." The document's apparent purpose is to assist employers in brainstorming possible accommodations that might be offered to eligible employees, not to purport to lay down a formal rule of law that paid leave (much less changes to compensation schemes) can never be required as reasonable accommodations.[4]

Ultimately, the Court finds that, even if it is theoretically possible that a request for a change in a compensation plan could constitute a reasonable accommodation, Ms. Peru has failed to demonstrate a triable issue of fact as to whether the accommodation she was requesting was a reasonable one. She offers no specific evidence clearly explaining how the existing compensation scheme put employees taking intermittent medical leaves at a disadvantage, nor

---

[4]That being said, the Court's own research has located no authority in which it was concluded that an employer's refusal to modify a compensation scheme in order to accommodate an employee taking intermittent leave due to a disability was found to violate the ADA.

does she describe a specific proposal that she made to remedy that situation, nor does she demonstrate that such a change was facially reasonable under the circumstances.  At best, Ms. Peru has offered a abstract or theoretical belief that the compensation plan could be modified to accommodate her, but has not established that she proposed a specific adjustment to the formula, much less shown that such an adjustment was facially reasonable.  *See Talley v. Family Dollar Stores of Ohio*, 542 F.3d 1099, 1108 (6th Cir. 2008) (employee "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable").  Accordingly, Ms. Peru has failed to establish a triable ADA claim based on a failure to accommodate theory.

B. Hostile environment harassment

Ms. Peru's second theory for her ADA claims is that T-Mobile created a hostile environment on the basis of her disability.  Many courts have concluded that the hostile environment harassment paradigm used with other non-discrimination laws is applicable in the context of a disability.  To establish such a claim, Ms. Peru must show: (i) she is a qualified individual with a disability under the ADA; (ii) she was subjected to unwelcome harassment; (iii) that harassment was based on her disability; (iv) the harassment was so severed and pervasive (in both an objective and subjective sense) as to alter the terms and conditions of her employment; and (v) there is a basis for imputing responsibility for that harassment to T-Mobile.  *Fox v. General Motors Corp.*, 247 F.3d 169, 176-78 (4th Cir. 2001).

Ms. Peru's complaints of harassment follow two general strands: (i) persistent mishandling of her FMLA leave; and (ii) mistreatment by her supervisor, Ms. Tuner.  The Court addresses each in turn.

1.  <u>Mishandling of leave</u>

In or about July 2007, Ms. Peru presented T-Mobile with information from her doctors, establishing her disability and requesting that she be given a reduced schedule and be permitted to take intermittent leaves of absence as her symptoms warranted.  T-Mobile granted this request, reducing her schedule to 32 hours per week and granting her the ability to use intermittent FMLA leave when needed.[5]

In early 2008, Ms. Peru took an extended medical leave of absence in conjunction with knee surgery.  She states in her chronology that T-Mobile "deducted an excess of 20 vacation hours and 80 FMLA hours above [the] legitimate deduction" relating to that incident, thus amounting to 100 hours of leave time "stolen by the HR Department."   Neither the documents cited in support by Ms. Peru nor T-Mobile's response to this issue fully explain the submitted calendar printouts, attendance records, and other materials.  As a consequence the Court is unable to assess whether the 100 hours deducted by T-Mobile was correct or not.  Accordingly, the Court accepts that Ms. Peru believes the deductions were inappropriate without making any finding as to the accuracy of that contention.

In March 2008, Ms. Peru's symptoms flared again and she sought another FMLA leave of absence.  She requested paperwork from T-Mobile, but her supervisor (apparently Ms. Turner) "refused to provide the packet, citing commission reasons."  Instead, the supervisor provided "HR-issued paperwork requesting a reduced schedule shift accommodation, citing 'personal reasons'" as the basis.  Neither party's briefing elaborates on this incident, but it

------

[5]There is some ambiguity on this point, as it appears that another of Ms. Peru's doctors requested a 34-hour per week schedule.  The Court finds the difference between a 32-hour week and a 34-hour week to be insignificant in these circumstances.

appears that Ms. Peru chose to continue to work rather than agree to the schedule request supplied by T-Mobile.

In September 2008, Ms. Peru again requested a reduced schedule (it is not clear whether she had returned to a full-time schedule in the interim) and intermittent leave.  T-Mobile provided Ms. Peru's supervisor with a "calendar citing FMLA hours," apparently to allow all involved to track Ms. Peru's accrued and available FMLA leave time.  However, Ms. Peru contends that this calendar "turned out to be a false record due to HR's prior theft of hours," causing her to have less accrued FMLA time than she believed was proper.  As a result, she was "marked unexcused throughout September" despite being on FMLA leave.

In October 2008, Ms. Peru experienced symptoms requiring her to take leave.  Her supervisor sent her text messages on several occasions, telling her that she "was not excused for FMLA leaves" (the ostensible reasons for the supervisor's belief are not stated) and that she "better get to work."  The supervisor and Ms. Peru each complained to the Human Resources department, who apparently directed that Ms. Peru obtain additional clarifying information from her doctor.  Ms. Peru eventually obtained the clarifying information, and T-Mobile issued a "revised FMLA accommodation letter" approving current and future intermittent leaves.  Ms. Peru states that she attempted to communicate with Human Resources about prior instances in which her absences were improperly designated as "unexcused" and the "theft" of her 100 hours, but the chronology does not detail the nature of T-Mobile's response.  Moreover, subsequent leaves Ms. Peru took in October continued to be improperly designated as "unexcused," damaging Ms. Peru's production statistics and employee ranking.  She requested that her statistics be manually adjusted, but no such adjustments occurred.

In November 2008, Ms. Peru was disciplined for excessive absenteeism.  Ms. Peru pointed out instances in which approved leave had been improperly recorded as unexcused absences and situations in which she was deemed to have insufficient leave due to the mis-allocating of the missing 100 hours.  She states that T-Mobile "reluctantly took these dates off the list of occurrences" and withdrew that aspect of the disciplinary notice, although she contends that the disciplinary warning was not removed from her "permanent record."

She was cited for additional unexcused absences in December 2008, resulting in another meeting with Human Resources.  T-Mobile stated that Ms. Peru's leave calendars were inaccurate and have "been retracted and revised without her knowledge," apparently because T-Mobile had changed the calculations by which Ms. Peru accrued FMLA leave.  Ms. Peru stated that she believed the change in calculations was inconsistent with prior representations that had been made to her.  She also complained that, as a result, her statistics were again negatively affected by improper charges of absenteeism.  T-Mobile's manager appeared to attempt to placate her, stating that "well, it's not like we're going to take it away from you" although it is unclear what the "it" in that sentence refers to.

In January 2009, Ms. Peru had a series of meetings with T-Mobile's Human Resources staff over the issues of leave and absenteeism.  Those meetings appear to have resulted in a mutually-satisfactory resolution of at least some of Ms. Peru's issues, as T-Mobile points the Court to a January 21, 2009 e-mail exchange between T-Mobile and Ms. Peru that recites the various agreements the parties reached, to which Ms. Peru responded in apparent assent, thanking the Human Resources representative for her assistance.  Ms. Peru's chronology acknowledges this resolution, but states that it "was a moot point" because T-Mobile "had been

providing false records for almost 5 months", that her statistics were "still marred and left uncorrected," and that the issue of the 80 missing FMLA hours had not been addressed or resolved.  Ms. Peru resigned her employment approximately one week after the January 21, 2009 meeting.

### 2.  Difficulties with Ms. Turner

Although Ms. Peru's summary judgment response repeatedly alleges that her supervisor, Ms. Turner, engaged in constant and ongoing harassment since mid-2007, Ms. Peru's allegations are largely conclusory.  The evidentiary material she provides, mostly Exhibit R2 to her response, describes a fairly discrete set of specific events.  In that transcript from her deposition, Ms. Peru relates a handful of specific incidents, nearly all of which relate to a meeting that occurred on January 26, 2009, the day before her resignation:

> • Prior to that meeting, when Ms. Turner informed her that a meeting was going the be held, Ms. Peru asked if there was a problem.  Ms. Turner replied "Yes."  Ms. Peru asked what the problem was, and Ms. Turner stated "I don't want you to have to – I don't want to have to make you quit like I made [a previous employee] quit."  Ms. Turner went on to state "We should be lucky we're not standing in an unemployment line somewhere."  (The context seems to indicate that the "we" in that statement included Ms. Turner.)  Later, when Ms. Peru was getting ready for the meeting, Ms. Turner "was hovering over me making these threatening statements," but Ms. Peru could not recall what those statements were.

> • At some point prior to the meeting, Ms. Turner "attempted to have me sign off on a shift bid ranking that was inaccurate; not in my favor."  Ms. Peru "told her I would not sign off on it until it was corrected."  Ms. Turner "was very dramatic and begrudging bringing me a corrected form."

> • The meeting on January 26, 2009 involved Ms. Peru, Ms. Turner, and Jim Nelson, T-Mobile's Manager.  Ms. Peru complained about a performance evaluation ranking she had received for the month

of July, and in response, Ms. Turner "starting hissing and screaming in my face," telling Ms. Peru that she was "the worst representative in this entire call center." Ms. Peru states that this went on "for five or six minutes," with Ms. Turner "within probably ten inches" of her face, getting red-faced and spitting as she yelled. Ms. Peru states that Mr. Nelson "turned around and started working on papers while Turner ranted at me."

• Ms. Turner also stated that "I should no longer take FMLA leaves so that I can work on my metrics [*i.e.* performance statistics]."

• After the meeting, Ms. Peru returned to her desk. Ms. Turner was standing nearby, engaged in a conversation with another employee. Ms. Peru states that she was listening to a voicemail message when Ms. Turner "turns around and yells at me, 'How many days are left?'." The record does not give any indication as to what Ms. Turner was referencing with this remark. The Court understands Ms. Peru to believe that the question was a reference to how many days of leave Ms. Peru had left to use, but Ms. Peru does not elaborate on the facts that led her to this conclusion.

• Shortly thereafter, while Ms. Peru was talking to customers on the phone, Ms. Turner stood on a chair near Ms. Peru's desk and "stood there screaming 'Fight the negativity' and other nonsense phrases."

Treating both types of allegations as true, Ms. Peru has failed to make a prima facie showing of a hostile working environment. As noted above, an employee alleging hostile environment harassment must show that the harassing conduct was "severe and pervasive" under both subjective and objective standards. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (applying Title VII). In other words, the conduct must be that which "a reasonable person would find hostile and abusive". In determining whether the conduct was <u>objectively</u> severe, the Court considers "all the circumstances" including the frequency of the conduct, its severity, whether it is "physically threatening or humiliating, or a mere offensive utterance," and whether it "unreasonably interferes with an employee's work performance."

Under this standard, the Court finds that the conduct, taken as a whole, was not objectively severe.  Turning first to the allegations of mishandling of her leave time (and assuming that such conduct could be cognizable as hostile environment harassment), the Court recognizes that it would be frustrating for any reasonable employee to have to repeatedly address apparent mistakes or miscalculations of leave time and attendance records.   Thus, although Ms. Peru's  frustration with prolonged bureaucratic inertia or even managerial incompetence in maintaining correct records is understandable, her level of frustration does not measure the severity of the conduct.

Ms. Peru believes that T-Mobile's mishandling of her attendance records and leave time was intentional, but she points to no evidence in the record that supports her belief.  To the contrary, the record refers to repeated meetings to discuss the issue and attempts by T-Mobile to rectify some of the mistakes (even if those attempts were ultimately ineffectual or abandoned). Thus, it appears that the mishandling of Ms. Peru's leave time and attendance records are more in the nature of  "ordinary tribulations of the workplace," rather than conduct that is particularly threatening, humiliating or that unreasonably interferes with her work performance.  *See e.g. Faragher*, 524 U.S. at 788.   Accordingly, the Court finds that the mishandling of Ms. Peru's leave time did not create or contribute to any hostile environment.[6]

This leaves "harassment" by Ms. Turner. Accepting Ms. Peru's version of the events during the January 26, 2009 meeting, the most serious and disturbing conduct was that of Ms.

---

[6]It is not inconsistent for the Court to, on one hand, find that Ms. Peru has stated a cognizable claim for interference with her FMLA rights, as discussed below, and, on the other hand, find that such interference did not contribute to any hostile environment.  As noted, bureaucratic incompetence might give rise to FMLA liability, but reflects nothing more than the "ordinary tribulations of the workplace" for hostile environment purposes.

Turner "screaming" at Ms. Peru about poor performance.  Because the severity of conduct involving criticism of an employee's work performance often is colored by the eye of the beholder, courts recognize that "even loud expressions of disapproval" fall within  "the kind of normal strains that can occur in any office setting." *Brooks v. Grundmann*, ___ F.Supp.2d ___, 2012 WL 10578944 (D.D.C. Mar. 29, 2012) (slip op.), *citing Singh v. U.S. House of Representatives*, 300 F.Supp.2d 48, 56 (D.D.C. 2004).  Even without consideration about perceptions of behavior, this record only specifies a single instance when Ms. Turner "screamed" at Ms. Peru.[7]  In addition, although Ms. Turner probably should not have suggested that Ms. Peru forego taking FMLA leave in order to improve her performance statistics, there is no indication that such suggestion was made in a threatening or insulting manner.  Indeed, the record indicates that such suggestions followed Ms. Peru's productive meeting with the Human Resources department regarding her entitlement to future leave, and therefore a reasonable employee would have understood despite Ms. Turner's suggestions,  that one could have a civil and productive discussion on that issue with higher-ranking management.

Accordingly, the Court finds that Ms. Peru's allegations of harassment fail to rise to the level of being objectively severe and pervasive.  T-Mobile is therefore entitled to summary judgment on any claim of hostile environment harassment under the ADA.

C.  Disparate treatment

To establish a claim for disability discrimination under a disparate treatment theory, Ms.

---

[7] Instances later that day, when Ms. Turner allegedly yelled "how many days are left" and "fight the negativity" were not directed at or made in close proximity to Ms. Peru. Suggestions of  later incidents of "screaming" are far too vague to permit an inference that they were comments relating to or motivated by Ms. Peru's disability.

Peru must first establish a *prima facie* case by showing: (i) that she is a qualified individual with a disability; (ii) that she suffered an adverse action; and (iii) she suffered that action in circumstances giving rise to an inference of discrimination.  *EEOC v. Picture People, Inc.*, 684 F.3d 981, 985 (10th Cir. 2012).  If Ms. Peru satisfies her burden, T-Mobile is required to articulate a legitimate, non-discriminatory reason for the adverse action, and Ms. Peru is required to prove that the proffered reason is a pretext for discrimination.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 & n. 3 (2003).  For purposes of a disparate treatment claim, an "adverse action" is one that effects a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007).

Once again, Ms. Peru's brief on this point is less than precise.  Giving her filings a liberal reading, the Court identifies two possible adverse employment actions.

### 1. Failure to promote

In November 2008, an opportunity for promotion to the "PDA Department" became available.  Ms. Peru's brief contends that her co-workers were "advised personally and verbally of the promotion," but she was not.  In addition, she argues in her brief  that although there was a requirement that an employee had to have been in their current job for six months in order to be eligible for promotion, an exception was made for everyone in her department but her.  Unfortunately, there is no reference by Ms. Peru to any evidence other than the announcement for the PDA position.

T-Mobile points to a portion of Ms. Peru's deposition that provides more insight into this issue.  Ms. Peru testified that she received an internal e-mail announcing the PDA vacancy,

including the eligibility requirement.  Ms. Peru recognized that she did not meet this

requirement, having just changed positions three months earlier.  She contends that two other

employees in her department who had also recently changed positions nevertheless applied for

the PDA opening, and when she asked how them how they considered themselves to be eligible,

they told her that Ms. Turner, their (mutual) supervisor, had told them that everyone in the

department was allowed to apply.  Ms. Peru reports that Ms. Turner never advised her of that

fact, even though Ms. Peru had earlier expressed interest in the position.  From this testimony,

the Court infers that Ms. Peru assessed the prerequisites for the position, did inquire about their

applicability, and based on her own assessment declined to apply for the PDA position.

On this record, the Court cannot say that Ms. Peru suffered an adverse employment

action in the form of a failure to promote.  T-Mobile cannot be faulted for Ms. Peru's decision

not to apply for the PDA opening, or for selecting not selecting her when she did not apply.  *See

e.g. Evans v. Federal Express Corp.*, 76 Fed.Appx. 263, 265 (10th Cir. 2003) (unpublished).  Ms.

Peru seeks to blame Ms. Turner for not telling Ms. Peru that she would be exempted from the

requirement of six months' time in position, but the record does not that Ms. Peru inquired about

the possibility of an exemption, that she was misled into believing that T-Mobile would hold her

to the time-in-position requirement, or that T-Mobile specifically gave information to other

employees but not to her.  On this record, it appears that  Ms. Peru's inaction, rather than T-

Mobile's action, that prevented her promotion.

Ms. Peru also contends that she was denied a second "promotion" opportunity in

December 2008 (and perhaps a third in August 2008), when she made a "shift bid"  to move to a

different shift or schedule.  T-Mobile argues that a change of shifts does not amount to an

adverse action, as it does not rise to the level of a "significant change in employment status."

*See Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998) ("mere inconvenience

or alteration of job responsibilities" not sufficient to amount to adverse action). Ms. Peru

appears to contend that she was attempting to change shifts to move away from the supervision

of Ms. Turner, whom Ms. Peru considered hostile towards her, but there is no indication that a

change of shift would have resulted in any different material benefit to Ms. Peru's employment

status.            Here, the Court agrees with T-Mobile.  It cannot say that the denial of a shift

change request, predicated on a desire for a different supervisor but otherwise involving no

material changes to the employees' responsibilities or pay, constitutes an adverse employment

action.  *See generally Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222 (10th Cir.

2006) ("not everything that makes an employee unhappy is [ ] actionable" as an adverse action).

Accordingly, the Court finds that Ms. Peru has failed to demonstrate a colorable disparate

treatment claim predicated on a failure to promote.

### 2. Constructive discharge

It is undisputed that Ms. Peru resigned her employment with T-Mobile on or about

January 27, 2009.  She contends that she did so because she felt she had no other option in the

face of "her direct supervisor's aggression and the Defendant's open unchecked harassment,

bullying, time theft, and discrimination."

Although an employee's voluntary resignation from employment ordinarily is not an

adverse action, an adverse action can be established where the employee shows that the

conditions in the workplace had become so intolerable that a reasonable employee would have

felt compelled to quit. *Narotzky v. Natrone County Mem. Hosp.*, 610 F.3d 558, 565-66 (10th Cir.

2010). This is described as a "constructive discharge".

Although the Court appreciates Ms. Peru's discomfort and frustration, the various events she describes, individually and together, do not rise to the level of a constructive discharge. Ms. Peru's contentions that the workplace had become intolerable repeat those asserted with regard to the hostile environment claim and failure to promote. For largely the same reasons that the Court finds that such allegations do not state cognizable violations of the ADA, they also are insufficient to constitute a constructive discharge. As previously noted, less than a week before she resigned, Ms. Peru had a productive meeting with T-Mobile addressing ongoing complaints of mishandled leave computation, and the parties appear to have reached a mutually-agreeable solution for that problem going forward. Absent a significant intervening negative event, the Court is extremely reluctant to conclude that a constructive discharge can occur when the parties have made recent progress on reaching a mutually-acceptable solution to such a significant number of the employee's ongoing complaints. Accordingly, the Court finds that Ms. Peru has failed to come forward with evidence sufficient to show that she suffered an adverse action in the form of a constructive discharge, and thus that T-Mobile is entitled to summary judgment on Ms. Peru's ADA claim in all respects.

4. FMLA claim

Finally, the Court turns to Ms. Peru's claims under the Family and Medical Leave Act. The FMLA contemplates at least two general theories of liability that may be at issue here: (i) failure to grant leave, 29 U.S.C. § 2615(a)(1) (an "entitlement or interference claim"), and (ii) disparate treatment discrimination or retaliation against an employee who has requested leave, 29 U.S.C. § 2615(a)(2) (a "retaliation or discrimination claim"). *Peterson v. Exide*

*Technologies,* 2012 WL 1184001 (10th Cir. Apr. 10, 2012) (slip op.), *citing Metlzer v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

The discrimination and retaliation claims are governed by the same analysis as a disparate treatment claim under the ADA – that is, Ms. Peru must, at a minimum, establish that she suffered an adverse action.[8]  *Id.* at n.1 (describing *prima facie* case). Because Ms. Peru has not identified any alleged adverse actions underlying her FMLA claim that are distinct from those the Court has already discussed with regard to her ADA disparate treatment claim, T-Mobile is entitled to summary judgment on her FMLA claim premised on a discrimination theory.

Turning to Ms. Peru's entitlement or interference claim, the FMLA requires an employer to grant an employee up to 12 weeks of unpaid leave per year where the employee requires such leave to address, among other things, a "serious health condition."  29 U.S.C. § 2612(a)(1)(D). The statute prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise any right provided under the FMLA."  29 U.S.C. § 2615(a)(1).   To establish an entitlement or interference claim, Ms. Peru must demonstrate: (i) she was entitled to take FMLA leave; (ii) that T-Mobile acted adversely to interfere with that right; and (iii) the action by T-Mobile was related to the exercise or attempted exercise of her

---

[8]Arguably, the analysis of whether a particular employment action is sufficiently adverse differs depending on whether the FMLA claim is considered to be in the nature of discrimination or retaliation.  *See generally Burlington Northern & Santa Fe RR Co. v. White*, 584 U.S. 53, 67-68 (2006) (in retaliation-type cases, an adverse action is one that "might well have dissuaded a reasonable worker from" invoking a statutory right or complaining of discrimination, a standard distinct from that applicable to alleged adverse actions in discrimination-type cases). Nevertheless, even if the Court construed Ms. Peru's FMLA discrimination claim to arise under a retaliation-type theory and examined Ms. Peru's alleged adverse actions under the more lenient *Burlington Northern* standard, it would reach the same result for essentially the same reasons.

rights.  *Sabourin v. Univ. of Utah*, 676 F.3d 950, 958 (10th Cir. 20120); *but see Campbell v.*

*Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2009) (suggesting that the employer

might bear the burden of (dis)proving the last element).  For purposes of this type of claim, an

"adverse action" is one that prevents the employee from taking the full 12 weeks of leave

guaranteed by the act, denies reinstatement to an employee returning from leave, or denies the

employee the initial permission to take leave.  *Campbell*, 478 F.3d at 1287.

 T-Mobile argues that Ms. Peru cannot prove that she suffered an adverse action.  It

contends that, in her deposition, Ms. Peru was unable to identify any situation in which she was

denied permission to take leave (with the exception of an instance in November 2007, when Ms.

Peru sought to take immediate leave, Ms. Turner denied the request, and Ms. Peru nevertheless

chose to leave anyway).

 The record does not squarely support T-Mobile's contention. It points to only one

interchange in Ms. Peru's deposition.  Ms. Peru was asked "How many times did you not take

leave although you were undergoing an episode?," to which she responded "I don't know.  I

don't recall."  T-Mobile's question on this point is ambiguous - by inquiring about instances in

which Ms. Peru "did . . . not take leave although [she] was undergoing an episode," T-Mobile

may have believed it was inquiring how often Ms. Peru requested to take leave but was denied,

whereas Ms. Peru might reasonably have understood the question to ask how often she

experienced symptoms that might have warranted taking leave but that she nevertheless decided

not to seek leave.  In contrast, the record reflects several instances in which Ms. Peru believed

she was taking approved FMLA leave for an absence, but which T-Mobile recorded her as

having an unexcused absence.  The record further indicates that Ms. Peru discussed this situation

on many occasions with T-Mobile, but that T-Mobile failed to correct its attendance records to reflect that Ms. Peru's absences were indeed excused.  Under these circumstances, the fact finder could reasonably infer that T-Mobile denied Ms. Peru's request to take leave to cover these absences.

Accordingly, the Court finds there to be an issue of fact as to whether T-Mobile denied Ms. Peru's "requests" to take leave.  This is the only ground upon which T-Mobile seeks summary judgment on this claim, and thus, Ms. Peru's FMLA interference claim must proceed to trial.

## CONCLUSION

For the foregoing reasons, T-Mobile's Motion for Summary Judgment (**# 101**) is **GRANTED IN PART**, insofar as T-Mobile is entitled to summary judgment on Ms. Peru's claims of breach of contract, promissory estoppel, violation of the ADA on a disparate treatment or hostile environment theory, and violation of the FMLA under a discrimination or retaliation theory, and **DENIED IN PART** insofar as Ms. Peru has demonstrated a triable claim for interference with her entitlement to use of FMLA leave and a concomitant failure to accommodate claim under the ADA premised solely on the failure to provide her with FMLA leave.

The parties shall jointly contact chambers to schedule a Pre-Trial Conference in anticipation of a trial on the sole remaining FMLA/ADA claim, and shall begin preparation of a proposed Pretrial Order as set forth in the Court's Order at Docket # 41.  Ms. Peru's Motion to Strike **(# 105)** Exhibit A from the Defendant's summary judgment motion is **DENIED**.  The Defendant's Motion to Restrict Access **(# 111)** to Exhibit B to its summary judgment motion is **DENIED**.  For the reasons discussed herein, the Clerk of the Court shall lift all access restrictions with regard to Docket # 125-127, with the exception of the items in Docket # 125 designated as Exhibits A, B, and U; those three exhibits shall remain subject to a Level 1 restriction.

Dated this 17th day of September, 2012

**BY THE COURT:**

Marcia S. Krieger
United States District Judge